02-12-029-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

 

NO. 02-12-00029-CV

 

 


 
 
 IN THE INTEREST OF A.J.T. AND R.A.C., CHILDREN
 
 
  
 
 
  
 
 


 

 

 

 

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION[1]

------------

I.  Introduction

In one issue, Appellant A.T. appeals the termination
of his parental rights to A.J.T.  We affirm.

II.  Background

A.T. pleaded guilty to and was convicted of the aggravated
sexual assault of a child—his stepson R.E.T.—and was sentenced to fifteen
years’ incarceration in September 2011.  In January 2012, A.T.’s parental
rights to A.J.T. and R.A.C. were terminated.[2]
 See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (Q), (2) (West 2008
& Supp. 2012).  A.T. does not appeal the termination of his parental rights
to R.A.C.[3] 
Instead, A.T. challenges only the trial court’s best interest finding with
regard to A.J.T. and not the grounds for termination under family code section
161.001(1), conceding that “there was factually sufficient evidence”
under section 161.001(1)(D) and (E) to support termination of his parental
rights.[4]

III.  Best Interest of the Child

A.T. complains that the evidence was legally and
factually insufficient to support the best interest finding “when the
Government failed to explore placement with the paternal grandmother, knowing
that it was an option” because the Department of Family and Protective Services
(DFPS) had been supplied with the appropriate information and that it is in
A.J.T.’s best interest to pursue this placement option.

A.  Standard of Review

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also id. § 161.206(a) (West 2008).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we disregard
contrary evidence unless a reasonable factfinder could not.  Id.  We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  Here, we must determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that termination of the parent-child relationship would be
in the best interest of the child.  See Tex. Fam. Code Ann. § 161.001(2);
In re C.H., 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire
record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  Nonexclusive factors that the trier of fact in a termination case may
use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of
the individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home
or proposed placement;

(H)     the acts or omissions of
the parent which may indicate that the existing parent-child relationship is
not a proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d
367, 371–72 (Tex. 1976) (citations omitted).

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

B.  Evidence

Laura Siqueiros, the family-based safety services
(FBSS) worker testified that she was assigned to the case in January 2011,
prior to CPS’s decision to remove the children.  Siqueiros said that she spoke
with A.T.’s mother but did not recall when and that she gathered his mother’s
contact information and passed it on when the case was transferred to a CPS
caseworker at the end of February 2011.

Melanie Scott, the current CPS caseworker, testified
that she entered the case in May 2011.  She stated that thirteen-year-old
R.E.T. had been placed at a residential treatment center in Houston and had
only recently started addressing some of his sexual abuse issues.  Eleven-year-old
A.J.T. and three-year-old R.A.C. were together in the same foster home.

Scott testified as follows with regard to her
interaction with A.T.:

Q.  During this case, has
[A.T.] personally given you the name of a person that you have been [able] to
run National Criminal Information checks on, CPS history on, that you have been
[able] to get an approved home study on, and that you have been [able] to get
this court to approve placement of his children with?

A.  No.

Q.  In fact, did you have
a telephone conversation with [A.T.] in mid-August, 2011?

A.  Yes, I did.  He
telephoned me and I talked with him.  I told him I would be sending his family
service plan to him, asked him if they had any questions.  He did not,
basically, and that was the conversation was I told him I would be sending him
a family service plan.  I did obtain an address, and I did send it to him
certified mail.

Q.  And did he say
anything in that conversation that day, hey, have you home-studied this person
or this is someone that my boys could go live with?

A.  No, he did not.

Q.  All right.  And just
to be clear, are [A.J.T.] and [R.A.C.] living in a foster home today?

A. Yes.

Q.  Okay.  How many
times, Ms. Scott, in the last seven months has [A.T.] mailed you letters or
cards asking you to tell his boys that he loves them, he cares for them, he’s
concerned for their well-being, things like that?

A.  No times at all.

Q.  All right.  Has
[A.T.] been [able] to show that he can protect [A.J.T.] and [R.A.C.] from
emotional and physical danger both now and in the future?

A.  No, he has not, and
him being incarcerated and being sentenced for 15 years shows that he’s not
[able] to protect them emotionally or physically.

Q.  All right.  Well,
what about his sexual abuse of [R.E.T.], the oldest child in this sibling
group?  Does that play into your assessment of whether or not [A.T.] can
protect his sons from emotional and physical danger now and in the future?

A.  Yes, it does.  He’s a
registered sex offender and he has more than one conviction of sexual abuse.

Q.  Has [A.T.] been
[able] to show that he can provide [A.J.T.] and [R.A.C.] with safe and stable
housing?

A.  No, he’s not.

Q.  Why do you say no to
that?

A.  Well, because he’s
incarcerated.  He’s not once written or notified me of any concerns or asked me
how the children are doing, even after I’ve sent him the service plan and sent
my information, my address and telephone number.

Q.  Has he given you the
names of any family members that you [have] been [able] to successfully
home-study and make temporary possessory conservators of his children?

A.  No, he has not.

Q.  Has [A.T.] shown that
he can provide [A.J.T.] and [R.A.C.] with minimally-adequate health and
nutritional care?

A.  No, he’s not.

Q.  Has [A.T.] shown that
he can appropriately discipline [A.J.T.] and [R.A.C.]?

A.  No.

Q.  Has [A.T.] shown that
he can supervise [A.J.T.] and [R.A.C.] consistently with the boys’ safety
needs?

A.  No.

Q.  Do you believe that
it’s in [A.J.T.’s] and [R.A.C.’s] best interest that this court today terminate
[A.T.’s] parental rights to each of these boys?

A.  Yes, I do.

Q.  And would you just
summarize for us why you believe that’s in [A.J.T.’s] and [R.A.C.’s] best
interest?

A.  Because of his sexual
convictions, and he’s was [sic] going to be incarcerated for the next 15 years.

Q.  What about his sexual
abuse of [R.E.T.]?  Does it play a role in it?

A.  Yes, it does.

During cross-examination, Scott testified that she did
not contact A.T.’s mother to see if she would be an appropriate placement for
the children because when she received the case, there was a home study already
being performed on another relative so that the children could remain together.
 She did not follow up with A.T.’s mother because when she spoke with A.T. on
the phone, “he never mentioned the children being placed with his mother.”  Scott
also said that A.T. did not give DFPS his mother’s name or her contact
information.

Scott said that DFPS’s plan for A.J.T. and R.A.C. was
to place them with R.C.’s sister Amy (a pseudonym) and to give Amy possessory
managing conservatorship of the children.  Scott said that it would be in
A.J.T.’s and R.A.C.’s best interest to be placed with Amy because she had seen
Amy interact with the children and A.J.T. had told her that he wanted to live
with Amy.  Scott said that Amy is a professional nanny, is very mature and
stable, and is bonded with the children; Amy has told Scott that she would be
willing to adopt the two boys.

The trial court admitted CPS’s home study of Amy’s
home.[5]
 The home study reflects that Amy has worked as a nanny for twenty-five years,
that Amy wanted the children placed with her because they are her nephews and
she loves them and wants what is best for them, that Amy has no criminal
history or CPS history, and that Amy has a job, a home, and a support network
to help her care for the children.  Mother agreed that if she could not have
custody of A.J.T. and R.A.C., Amy was the best person for the two boys and that
the two boys love Amy.

A.T. was present at trial but chose not to testify,
and he did not put on any evidence.

The children’s ad litem attorney recommended Amy to
the trial court as “an excellent placement for the two little ones who seem to
be doing pretty well since they’ve gotten out of the situation they were in.”  A.T.’s
sole closing argument was to request that if the children’s placement broke
down “that his mother be considered actively for placement of his children.”

C.  Analysis

A.T. argues that A.J.T. was denied better permanence “by
the Government’s failure to explore the option of placing” A.J.T. with A.T.’s
mother.

Until DFPS identifies a relative or other designated
individual qualified to be a substitute caregiver, the department must continue
to explore substitute caregiver options, and DFPS may place a child with a
relative or other designated individual identified by a parent or other
person having legal custody of a child if it determines that the placement
is in the child’s best interest.[6] 
See Tex. Fam. Code Ann. §§ 261.307(a) (West 2008), 262.114 (West 2008
& Supp. 2012).  Further, “[t]he determination of where the child will be
placed is a factor in evaluating the child’s best interest, but it is not a bar
to termination that placement will be with non-relatives.”  In re K.W.,
No. 02-09-00041-CV, 2010 WL 144394, at *10 (Tex. App.—Fort Worth Jan. 14, 2010,
no pet.) (mem. op.); see also In re D.C., No. 01-11-00387-CV, 2012 WL
682289, at *13 (Tex. App.—Houston [1st Dist.] Mar. 1. 2012, pet. denied) (mem.
op.) (stating same).

Based on the testimony at trial, the trial court could
have concluded that A.T. did not suggest to his CPS caseworker that his mother was
a potential placement for A.J.T.  Cf. Tex. Fam. Code Ann. §§ 261.307(a),
262.114.  Further, there was no evidence at trial that A.T.’s mother wanted
A.J.T. or would have been an appropriate placement for him or that A.J.T. would
want to go to her.  Cf. D.C., 2012 WL 682289, at *13 (noting that there
was evidence that paternal aunt did not want the children and no evidence that
the children knew her or wanted to live with her).  Additionally, placement
with Amy, a professional nanny and A.J.T.’s step-aunt, allowed A.J.T. to remain
with his half brother R.A.C., and the record reflects that Amy was a stable,
permanent placement for both boys and that A.J.T.’s preference was to be with her. 
See Holley, 544 S.W.2d at 371–72; cf. Horvatich v. Tex. Dep’t of Protective &
Regulatory Servs., 78 S.W.3d 594, 599–600,
603–04 (Tex. App.—Austin 2002, no pet.) (concluding, when DPRS failed to
provide any testimony regarding its plan for the children, including whether
DPRS would attempt to place the siblings together, and the children’s maternal
grandmother testified that she told DPRS that she wanted custody of the
children and had worked services to be considered a placement, there was
insufficient evidence to show that termination of parental rights was better
for the children than placement with a viable relative).

Viewing the record in the light most favorable to the
finding and the judgment, we conclude that the trial court could have
reasonably formed a firm belief or conviction that termination of A.T.’s
parental rights was in A.J.T.’s best interest despite A.T.’s mother not being
considered for placement.  See J.P.B., 180 S.W.3d at 573. 
And based on the entire record, we reach that same conclusion.  See H.R.M.,
209 S.W.3d at 108.  Therefore, the evidence is legally and factually sufficient
to support the trial court’s best interest finding, and we overrule A.T.’s sole
issue.

IV. 
Conclusion

Having overruled
A.T.’s sole issue, we affirm the trial court’s judgment.

 

 

                                                                              PER
CURIAM

 

 

PANEL:  MCCOY, MEIER, and GABRIEL, JJ.

 

DELIVERED:  August 16, 2012









[1]See
Tex. R. App. P. 47.4.





[2]At
the termination trial, the trial court admitted A.T.’s 2011 conviction as well
as his August 27, 1987 probation revocation for possession of a controlled
substance (cocaine), his January 23, 1989 conviction for sexual assault, and
his April 11, 2006 conviction for failure to comply with sex offender
registration requirements.





[3]While
A.T. is the presumed father of both A.J.T. and R.A.C., R.C. is R.A.C.’s alleged
biological father.





[4]During
the pendency of this case, Mother and R.C. repeatedly tested positive for
methamphetamine and failed to complete their service plans; they both have
several drug convictions.  R.E.T. told a Child Protective Services (CPS)
investigator that Mother was not home when A.T. sexually abused him because she
was in jail.  R.E.T.’s father C.T. died in 2006 as a result of a drug
overdose.  R.C. and Mother have not appealed the termination of their parental
rights.





[5]CPS
was also conducting a home study on one of R.E.T.’s paternal aunts in San
Antonio for R.E.T.’s placement upon his successful discharge from the
residential treatment center.





[6]We
have previously noted that family code section 262.114 does not prescribe a
sanction or consequence for DFPS’s failure to complete a home study.  In re
J.F., No. 02-07-00007-CV, 2007 WL 2963690, at *6, 8 (Tex. App.—Fort Worth
Oct. 11, 2007, pet. denied) (mem. op.) (concluding that it is the children’s
safety that is of paramount importance with regard to a DFPS placement), disp.
on merits, No. 02-08-00183-CV, 2009 WL 806889, at *9 (Tex. App.—Fort Worth
Mar. 26, 2009, pet. denied) (mem. op.).